VALLE et al. *v.* PRESSMAN et al.

[No. 201, September Term, 1962.]

(Three Appeals In One Record)

*Decided per curiam September 11, 1962.*

*Opinion filed November 5, 1962.*

The cause was argued before Brune, C. J., and Henderson, Hammond, Prescott, Horney, Marbury and Sybert, JJ.

*W. Lee Harrison,* with whom were *Michael Paul Smith* and *Richard C. Murray,* and *Norman Polovoy,* on the brief, for Francis J. Valle, one of appellants.

*Patrick A. O'Doherty,* with whom were *William A. Hegarty* and *Richard T. Moxley* on the brief, for Democratic State Central Committee of Baltimore City, other appellant.

*Hyman A. Pressman,* in proper person, *Jack M. Fox,* in proper person, and *Mark D. Coplin* and *Robert F. Skutch, Jr.,* with whom were *Weinberg & Green* on the brief, for Lawrence Stevenson, appellee.

*Thomas B. Finan, Attorney General,* with whom was *Robert F. Sweeney, Assistant Attorney General,* on the brief, for Board of Supervisors of Elections of Baltimore City, appellee.

HAMMOND, J., delivered the opinion of the Court.

On the day after argument we affirmed by per curiam order a decree of the Circuit Court of Baltimore City which held that the purported nomination of Francis J. Valle as Democratic candidate for State's Attorney of Baltimore by the State Central Committee of Baltimore City (the "City Committee") was invalid and that paper writings submitted to the Board of Supervisors of Elections of Baltimore City, purporting to certify Valle's nomination by the Committee, were null and void. The reasons for the affirmance follow.

Saul A. Harris, who had been nominated as the Democratic candidate for State's Attorney of Baltimore in the May, 1962 primary election, died on August 11. While his funeral was in progress on August 13, a meeting of the City Committee, convened by three of its members who had sent telegrams to the other members just before midnight of the day before, was held at a restaurant in Baltimore. Ten of the eighteen members of the Committee, including Anthony E. Gallagher (who had been convicted of grand larceny in 1953 by the Criminal Court of Baltimore) and Domenick DiPietro (who had been convicted of conspiracy to violate the naturalization laws in 1940 by the United States District Court for the District of Maryland) were present. The ten members in attendance signed a paper certifying that Francis J. Valle was the

nominee of the Committee to be the Democratic candidate for the office of State's Attorney of Baltimore. The certificate was delivered the same day to the Board of Supervisors of Elections of Baltimore.

The Attorney General had written the Supervisors on July 5, 1962, that Gallagher was ineligible to vote because of his conviction. On July 10 the Board of Supervisors of Elections wrote Gallagher that unless he challenged the conviction within two weeks, his registration as a voter would be cancelled. He did not reply, and on July 25 his name was removed from the list of voters. On August 14 the Attorney General, apparently on his own initiative, wrote the Board that Gallagher was not registered as a member of a political party and, therefore, was ineligible to be a member of the Democratic State Central Committee, that a vacancy existed "nunc pro tunc" on the Committee from the Third District of Baltimore City and that Gallagher's name should be deleted from the list of members of the Committee. The Board immediately deleted his name, and on August 15 wrote the Acting Chairman of the Democratic State Central Committee for the State of Maryland (the "State Committee") that it had done so and that a vacancy existed on the City Committee "nunc pro tunc." A copy was sent to the Secretary of State of Maryland and the Clerk of the Superior Court of Baltimore (with whom the Board had filed Valle's certificate of nomination).

On August 15, again just before midnight, four members of the City Committee sent telegrams to the other members calling a meeting of the Committee for eleven a. m. the next day, Again ten members were present, including Gallagher. DiPietro did not attend; but Franklin L. Waldt, who was not at the first meeting, came to the second. The nomination of Valle was ratified and confirmed, and a certificate that he was the Democratic nominee was signed by each of the ten members and left that day with the Supervisors.

There was testimony the custom and usage of the City Committee was that ten members constituted a quorum and each member had one vote.

Three bills of complaint seeking to invalidate the Valle nomination soon were filed in the Circuit Court of Baltimore

City. One, later supplemented, by Hyman Pressman, suing as a citizen, taxpayer, resident of Baltimore, and member and voter of the Democratic Party, and alleging irreparable harm, impairment of civil rights and waste of taxpayers' funds in printing illegal ballots and holding an illegal election, was against the Supervisors and Valle. It claimed that the City Committee meetings were invalid because Gallagher and Di-Pietro were disqualified so that a quorum was not present, that unit voting was required, that reasonable notice was not given, and that the power and authority to fill the vacancy was in the State Committee and not in the City Committee.

Another was by Jack M. Fox, suing as a resident, a taxpayer and a registered voter of the Democratic Party, against Valle, the Supervisors and the eighteen members of the City Committee as "members of and constituting the Democratic State Central Committee of Baltimore City." He relied for relief on the contention that the State Committee and not the City Committee was empowered under the applicable statutes to fill the vacancy in the nomination for State's Attorney. The third, by Lawrence J. Stevenson, suing as a member of the City Committee (who had not attended either meeting), a resident and a voter affiliated with the Democratic Party, and alleging irreparable harm to him as a citizen, taxpayer, voter and member of the Party and its Committee, was against the other members of the City Committee, as members, and the Board of Supervisors. Its reliance was on improper and inadequate notice, lack of a quorum (because of the disqualification of Gallagher and DiPietro) and the failure to vote by the unit vote.

The cases were consolidated. Each of the defendants demurred on the grounds that a court of equity had no power or right either to determine an election or political contest or to try title to office, lack of necessary parties and lack of standing of the complainants to sue.

We think the demurrers were overruled properly. The general rule that a court of equity may not decide election contests or interfere in political controversies is not inflexible and lately has been considerably relaxed. See *Maryland Committee for Fair Representation v. Tawes*, 228 Md. 412, following

*Baker v. Carr,* 369 U. S. 186, 7 L. Ed. 2d 663. *Soper v. Jones,* 171 Md. 643, held that a court of equity had jurisdiction of a taxpayer's suit to enjoin the Secretary of State from certifying the name of a candidate because of his failure to comply with statutory requirements as to signature. Chief Judge Bond referred to the general rule that equity will not decide election cases and said for the Court: "But a contention that no controversy that affects elections may be heard and decided by the Court would be at odds with other decisions," and cited cases in equity in which jurisdiction had been entertained, such as *Carr v. Hyattsville,* 115 Md. 545 (a bill to invalidate a referendum election on a local act) ; *Graf v. Hiser,* 144 Md. 418 (a bill to declare a referendum election invalid as improperly held) ; and *Sun Cab Co. v. Cloud,* 162 Md. 419 (a bill to restrain the holding of a referendum election because the signatures seeking it did not meet constitutional requirements). Judge Bond went on to point out that in the *Sun Cab* case a distinction was drawn between "interferences by the courts with the political conduct of elections, and taking jurisdiction of a question whether persons assuming to avail themselves of the election machinery set up for private initiative are persons entitled under the law to do so."

In *Hammond v. Love,* 187 Md. 138, a mandamus case, this Court said that administrative or official decisions and actions in regard to the elective process which are arbitrary or contrary to law are subject to review by the courts. In *Mayor & Town Council of Landover Hills v. Brandt,* 199 Md. 105, 107, Judge Henderson for the Court restated earlier holdings that the statute which says the judges of the circuit courts and of the Superior Court of Baltimore City should decide contested elections in certain cases (now Code (1957), Art. 33, Sec. 145) does not confer jurisdiction in equity, and said: "Nor would equity have inherent jurisdiction in the absence of fraud, or arbitrary or illegal action." The Court affirmed the chancellor's action in recounting the ballots because the case could have been removed from equity to law and heard before the same judge. Other cases involving matters pertaining to elections in which equity has acted and in which no question of its right to do so was raised include *Wilkinson v. McGill,* 192 Md. 387 ;

*Nutwell v. Supervisors of Election,* 205 Md. 338 (bill to nullify action of a State Central Committee in certifying a nominee) ; *Lexington Park, etc. v. Robidoux,* 218 Md. 195.

The bills in the case before us charged illegal action in the nomination by the City Committee which, they alleged, had no power to nominate since the statutes confided that duty to the State Committee. We think they stated a cause of action of which equity had jurisdiction at the suit of the taxpayers, party members and voters who brought the actions, and that all parties necessary to a determination of the question raised were joined.

In passing on the merits of the case, Judge Niles, invoking Maryland Rule 501 ("The Court in furtherance of convenience or to avoid prejudice may order a separate trial * * * of any separate issue * * * or issues"), determined from the pleadings, stipulation of the parties and opening statements that the decisive issues were: (a) whether the State Central Committee for Baltimore City or the Committee for the entire State had the power under the statutes to make the nomination; and (b) whether, assuming it was the City Committee, a quorum of that Committee had properly and effectively acted at either the first or second meeting. He took testimony on these issues in a trial conducted with exemplary judicial fairness, objectivity, and expedition and, pursuant to Maryland Rule 502, of his own motion, found it convenient, before going further, to decide the questions of law which had been raised in the manner he had found expedient. Judge Niles held: (a) that the State Committee and not the City Committee had the power to nominate a candidate for State's Attorney of Baltimore in case of a vacancy, and the purported actions of the City Committee in nominating Valle were of no effect; and (b) Gallagher and DiPietro were not eligible to be members of the State Central Committee and therefore there had not been a quorum at either the first or second meeting.[1]

We agree with Judge Niles' ruling on the first question and,

---

1. Judge Niles held that Waldt, who represented the Second District on the Committee although he lived in the Third, was an eligible member of the Committee.

accordingly, do not reach the second question or any sub-sidiary ones, such as the need *vel non* of the City Committee to vote by the unit rule or the adequacy of notice of the meetings.

Section 74 (b) of Ch. 739 of the Laws of 1957 (Code (1957), Art. 33, Sec. 74 (b)) under the general heading "Vacancies in Nominations" and under the subtitle "Filling Vacancies," reads:

> "(b) State, Judicial, Congressional Vacancies. In the event of any vacancy occurring because of the death or resignation of any person nominated for any State or Judicial office, or as a candidate for member of the Congress of the United States or for United States Senator, under provisions of the preceding sections of this Article, such vacancy shall be filled by the State Central Committee, or governing body for the State, of the political party to which said nominee belongs."

Section 75 under the general heading "Local Vacancies" reads:

> "Local vacancies shall be filled by the State or local central committee, of the political party to which said nominee belongs. In the event of any vacancy occurring because of the resignation or death of any person so nominated or because of a tie vote in any primary election for any office in any county of this State or legislative district of Baltimore City, such vacancy shall be filled by the State or local central committee or governing body of the party to which said nominee belongs of the county or legislative district in which any such vacancy occurs, provided that where the vacancy results from a tie vote, the nominee selected to fill the vacancy as aforesaid shall be one of the candidates receiving the tie vote."

Local vacancies are in effect defined in Section 75 as those existing in a nomination for any office in any county or legislative district of Baltimore; and any such vacancy, the statute directs, is to be filled by "the State or local central committee

or governing body of the party to which said nominee belongs of the county or legislative district in which such vacancy occurs." Clearly a vacancy in Baltimore is not within the definition of a local vacancy because it is not one in a legislative district (which for the purposes of the Section, at least, is equated to a county) but rather one for a political subdivision comprised of six legislative districts.

Appellants urge that the words "State * * * Vacancies" in Sec. 74 (b) is intended to mean vacancies in "State-wide Offices." Before the general and sweeping revision of the election laws, proposed by the Wheatley Committee and enacted by the Legislature at the 1957 Session, "State Office" was defined, Code (1951), Art. 33, Sec. 64 (a) (which dealt with nominations by Party Conventions), as "an office filled by the vote of all the registered voters of the State of Maryland," and "State-wide Office" was not defined. See *Vaughan v. Boone,* 191 Md. 515, 519.

The 1957 revision eliminated the definition in Sec. 64 (a) and substituted in Sec. 79 (b) under the general heading "Party Conventions" the following:

"(b) Nominations of United States Senator, Governor, Attorney General, Comptroller.

The candidates of such political parties for United States Senator, Governor, Attorney General and Comptroller shall be nominated in the manner prescribed in this Article by State Conventions."

The 1957 revision also defined "State-wide Offices" in Sec. 55 as those "to be filled by the voters of the entire State or (with the exception of Judges) of any division of a greater extent than one county." In Sec. 57 (b) Candidates for "State-wide Offices" are said to be those for Governor, the United States Senate, Comptroller, and Attorney General. "State Office" was not defined in the 1957 Act.

We said in *Board v. Weiss,* 217 Md. 133, 138, that the Wheatley Committee had studied the election laws for five years and their revision of those laws, adopted by the Legislature, was "no mere casual rearrangement of Sections," and that "* * * it would be unreasonable for us to hold that any

changes in the law resulting from so detailed a study were inadvertent and not intended."

We think the term "State Office" was used in Sec. 74 (b) not as meaning "State-wide Office" but in contrast and distinction to a local office dealt with in Sec. 75. If "State Office" in Sec. 74 (b) had been intended to mean "State-wide Office," there would have been no purpose in referring therein in terms to a "candidate * * * for United States Senator" because "State-wide Office," which is defined in the 1957 Act as being one filled by all the voters of the State, would necessarily include the office of United States Senator.

The language of Sec. 56 (c) of Ch. 739 of the Laws of 1957 (Code (1957), Art. 33, Sec. 56 (c)) adds support to the conclusion we have reached. It provides that if there is a vacancy for any office by reason of there being no candidate of a political party to file for the same in a primary election "such vacancy shall be filled by the State Central Committee, or governing body, of the political party for the State for any officer elected by the voters of more than one County or Baltimore City; in all other instances the vacancy shall be filled by the State Central Committee of the political subdivision." On their face the quoted words say that a vacancy in Baltimore City, in case no candidate files in a primary, shall be filled by the State Committee. Code (1957), Art. 1, Sec. 14, states that, "The word county shall be construed to include the City of Baltimore unless such construction would be unreasonable." The words "or Baltimore City" would not have to have been used if it had been intended that the State Committee was to act only if two or more counties or one or more counties *and* Baltimore City were involved. We think the reference to Baltimore City must be given effect and read to mean that a vacancy in an office which is voted on by the voters of all six districts of the City is to be filled by the State Committee.

Section 56 (c), which deals with vacancies for lack of candidates, and Sec. 74 (b), which deals with vacancies by reason of death or resignation, relate to the same subject matter and should be harmonized in meaning and effect, if possible. We read them both as saying that a lack of a candidate for the office of State's Attorney in Baltimore City is to be

supplied by the State Committee and not the City Committee.

Appellants, while arguing that a State's Attorney is not a State-wide Officer within the meaning of the election statutes, do not challenge Judge Niles' holding that a State's Attorney is a State rather than a local officer. We find it plain that they could not successfully do so. The office is created by the Constitution which in Art. 5, Sec. 7, provides (in parts here pertinent) : "There shall be an Attorney for the State in each county, and the City of Baltimore, to be styled 'The State's Attorney,' who shall be elected by the voters thereof * * * and be subject to removal * * * by a vote of two-thirds of the Senate, on the recommendation of the Attorney General." Removal is thus a State and not a local function. The naming of a successor to a State's Attorney who dies or resigns during his term is confided to the Judges of the political subdivision in which he was serving, and Maryland Judges are Officers of the State. Attorney General Armstrong ruled in 6 Op. of the Attorney General 427 that a State's Attorney was a State Officer; and the Supreme Court, in *Spielman Motor Co. v. Dodge,* 295 U. S. 89, 93, 79 L. Ed. 1322, 1324, quoted the Court of Appeals of New York in *Fellows v. New York* (1876), 8 Hun. 484, 485, as follows: " 'It is conceded that the district attorney is a State officer. It could not well be questioned.' " and held a District Attorney to be in a true sense an officer of the State.

As the *per curiam* order heretofore filed affirming the decree of the trial court did not direct the payment of costs, it is ordered that the appellants pay them.

HORNEY, J., filed the following concurring opinion, in which BRUNE, C. J., concurred.

The majority hold that the purported nomination of Francis J. Valle (Valle) as the Democratic candidate for State's Attorney of Baltimore City was invalid because the nomination of a candidate to fill the vacancy caused by the death of Saul A. Harris should have been made by the state-wide State Central Committee instead of by the city-wide committee. All of the members of the Court agree that the selection of Valle as the nominee was invalid, but, to us, the nomination of a candidate to fill the vacancy was a function of the City Committee.

There is no question that a State's Attorney is a State officer, but he is elected by the qualified voters in the political subdivision of which he is a resident, and should he die, resign or be removed during his term of office, his successor would be appointed by the judges of the court having jurisdiction of criminal cases in the political subdivision in which he was serving. It would seem therefore that a State's Attorney, even though he be a State officer in one sense, is, nevertheless a county or city officer (as the case may be) in that he is the prosecuting officer for the State of Maryland only in the political subdivision in which he is elected or appointed. Thus, it seems to us, that the nomination of a candidate to fill the vacancy in that office should have been made by the City Committee.

Code (1957), Art. 33, § 74 (b),[1] stipulates that a vacancy caused by the death of a nominee for any state or judicial office or a candidate for either house of Congress shall be filled by the State Committee of the political party of which the deceased nominee was a member. But § 75 provides that a local vacancy (in the event of the death of a nominee) shall be filled by the local committees of a county or the legislative districts of Baltimore City. And, although it is not specifically applicable to the situation presented by this case, the provisions of § 56 (c), at least to us, indicate that the State Committee should fill a vacancy only when such vacancy pertains to an officer to be elected by the voters of more than one political subdivision.

The words of § 56 (c) relied on by the majority as supporting their interpretation of §§ 74 and 75 seem to us to have a directly opposite effect. Under the provisions of § 56 (c), the state-wide committee is impowered to fill a vacancy due to the lack of a candidate at the primary election "for any officer elected by the voters of more than one county or Baltimore City"; and "in all other instances the vacancy shall be filled by the State central committee of the political subdivision." The phrase "elected by the voters of more than one county or Balti-

---

1. All references to code sections throughout this opinion are to Article 33 (Elections) of the 1957 Code.

more City" seems to us to be simply and clearly an elliptical or compressed form of expression meaning "by the voters of more than one county or *of more than* Baltimore City." The italicized words are, we think, implicit. Without them, the result is indeed strange—the state-wide committee must make a nomination upon which only the voters of Baltimore City may cast their ballots.

Section 75 dealing with local nominations starts off with a general provision. It follows this with a careful provision recognizing the difference which exists in practice between county committees and city-wide committees. In the city, the three members of the city-wide committee from each of the six districts constitute a political committee for the district. We know of no parallel situation in any of the counties. No reason is apparent to us why the General Assembly should have deemed the state-wide committee to be the appropriate nominating body for an office filled only by the voters of Baltimore City, when it clearly did not do so—in fact it did the exact opposite—in the case of offices to be filled by the voters of one county. We do not think the language of either § 56 (c) or of §§ 74 and 75 is properly susceptible of a construction which would bring about so anomalous a result. As reflecting on the general plan for differentiation between offices to be filled by the voters of only one, or of more than one political subdivision, § 55 seems relevant. This specifies the places for filing certificates of candidacy. In general, candidates for offices to be filled by the voters of the entire State or "of any division of a greater extent than one county" [2] file certificates with the Secretary of State (subsection (a) of § 55), and for all other nominations certificates are to "be filed with the supervisors of elections of the respective counties or of Baltimore City,

---

2. All candidates for Congress, regardless of the composition of their districts, must file certificates with the Secretary of State. Specific provisions are also made with regard to candidates for judicial office. These conform to the general pattern. Thus, a candidate for the Supreme Bench of Baltimore City or for the Court of Appeals from the sixth appellate judicial circuit (Baltimore City) would file his certificate with the Board of Supervisors of Elections of Baltimore City.

wherein the offices are to be filled by the voters" (subsection (c) of § 55). Here, the reference to Baltimore City seems to us no more necessary or significant than in § 56 (c). We also observe that it is not separately referred to in § 55 (a), which obviously deals with the opposite side of the same coin dealt with in § 55 (c).

There are six legislative districts in Baltimore City. Each district, apparently in accordance with usage, has a local central committee or governing body composed of three members, and each member of each district committee—except when a committee is required to vote as a unit at a state-wide committee meeting—is entitled to cast one vote at a district meeting or a city-wide meeting. See § 82 (b). When meeting as a City Committee the total membership is eighteen.

The record discloses that at the first meeting (on August 13) and at the second meeting (on August 15) only ten persons purporting to be members were present, and, of these at least one member was not eligible to serve as a party officer. One of the members of the third district committee, Anthony E. Gallagher, an alleged felon who had not been pardoned, was removed from the registration list of qualified voters before the date of the first meeting and, although he had been duly notified of such removal, he neither protested the removal nor sought to be reinstated and was subsequently removed as a committeeman. Quite possibly one other ineligible purported member was present at each meeting.[3] Thus, even if it is assumed that the notice of the meetings of the City Committee were adequate, the nomination of Valle had no effect because there was not a lawful quorum at either the first or second meeting.

We think it necessary to discuss only the situation of Anthony E. Gallagher. He had been removed in July from the registration list of qualified voters upon a ground based on

3. Domenick DiPietro, another person alleged to have been convicted of a felony or other infamous crime, attended the first meeting as a member of the first district committee, but was not at the second meeting. And Franklin L. Waldt, who, though he resided in the third district, had been elected as a member of the second district committee.

Section 2 of Article I of the Constitution of Maryland. See also §§ 19, 44 and 186 (of Art. 33 of the Code). The removal of his name was effected pursuant to § 44 (a). It is our opinion that when he ceased to be a registered voter (if not when he registered improperly), he ceased to be affiliated with the Democratic Party within the meaning of the election laws (see § 60), and hence he was ineligible to serve or to vote as a committee member on August 13th or 15th; and therefore could not be counted for the purpose of constituting a quorum at either of the meetings held on those dates.

The general rule with respect to a public official is that eligibility to hold office is of a continuing nature and must exist not only at the commencement of the term but during the occupancy of the office. Some of the courts of other states hold that the date of election or appointment is the time to test eligibility to hold office. But most of the courts hold that even though a candidate is qualified at the time of his election this is not sufficient to entitle him to qualify and continue to hold office, if, at the commencement of the term, or during the continuance of the incumbency, he ceases to be qualified. See 42 Am. Jur., *Public Officers,* § 41. And see 88 A.L.R. 812, 828, Part IV, and the cases cited, particularly *Jeffries v. Rowe,* 63 Ind. 592 (1878); *State ex rel. Johnston v. Donworth,* 105 S. W. 1055 (Mo. App. 1907); *State ex rel. Fugina v. Pierce,* 209 N. W. 693 (Wis. 1926); and *State ex rel. Coe v. Harrison,* 114 So. 905 (Ala. 1927). In the *Coe* case, in which a councilman after induction into office failed to pay the state poll tax and therefore ceased to be a qualified elector, it was held that he had vacated the office. Cf. *Lilly v. Jones,* 158 Md. 260, 269-72, 148 Atl. 434 (1930), where it was held that under the provisions of the Baltimore City Charter prohibiting the appointment as a member of the City Service Commission one "holding any public office," a member of that commission ceased to be qualified for membership if during his term he accepted appointment to another public office.

While it has been held (*Usilton v. Bramble,* 117 Md. 10, 82 Atl. 661 (1911)), that a member of a political committee is not a public officer, it seems to us that the rules relating to eligibility to hold a public office are just as applicable—indeed

even more so—to a party official as to a public official. Furthermore, if, instead of analogizing a party official to a public official, he is analogized to a director of a corporation, a director who is disqualified from voting at a board meeting cannot be counted for the purpose of making a quorum. *Hagerstown Furniture Co. v. Baker,* 158 Md. 574, 149 Atl. 556 (1930). See also 19 C.J.S., *Corporations,* § 749c. In the absence of a contrary provision in a governing instrument (such as a statute, the charter or a by-law), a majority of the entire authorized number of members of a board of directors, regardless of any vacancies or disqualifications, is necessary to constitute a quorum. *Hagerstown Furniture Co. v. Baker,* 158 Md. at 585; 2 Fletcher, *Cyclopedia of Corporations,* (Rev. Vol. 1954), § 421, pp. 276-78; and half of the directors is not a quorum. 2 Fletcher, *op. cit. supra,* § 419, p. 273.

We are further of the opinion that the doctrine of *de facto* officers is not applicable here. That doctrine "has been characterized as 'one of those legal makeshifts by which unlawful or irregular corporate and public acts are legalized for certain purposes on the score of necessity.' " 2 Fletcher, *op. cit. supra,* § 372, p. 198, citing *Mortgage Land Investment Co. v. Mc-Mains,* 215 N. W. 192 (Minn. 1927). In *Richards v. Farmers & Mechanics' Institute,* 26 Atl. 210 (Pa. St. 1893), the court said: "In the case of public corporations the reasons for holding the acts of de facto officers binding on the corporations they represent are doubtless stronger than in the case of private corporations, but, to some extent at least, they are the same in both, differing only in degree." 2 Fletcher, *op. cit. supra,* § 372, p. 199, adds: "For the most part the rule applies only to protect third parties dealing with such officers."

The doctrine of *de facto* officers is, of course, well established in this State. See *Reed v. President (and Town Commissioners) of North East,* 226 Md. 229, 172 A. 2d 536 (1961), and cases therein cited. See also *Hetrich v. Co. Commissioners (of Anne Arundel County),* 222 Md. 304, 159 A. 2d 642 (1960), and *Kimble v. Bender,* 173 Md. 608, 196 Atl. 409 (1938). The Maryland cases recognize the practical public necessities and the considerations of fairness as regards the rights of third parties upon which the doctrine rests. We find

nothing in the present case which would call for a conclusion that the rights of the public are involved or that Valle had in some way been misled by appearances into taking some action which constituted a detriment to him. In our opinion, the essential element for the invocation of the doctrine, so far as Valle was concerned, is basically estoppel (see 2 Fletcher, *op. cit. supra*, § 430, p. 297) and that was lacking in this case.

We are accordingly of the opinion that Valle was not validly nominated and for that reason concur in the result reached by the majority.